UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM COSTIGAN, JR., | ) | Case No. 5:14CV1002 |
| | ) | |
| Plaintiff, | ) | JUDGE GEORGE J. LIMBERT |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN HANCOCK INSURANCE, | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion to Dismiss the Second Amended Complaint filed on behalf of Defendant, John Hancock Insurance on September 4, 2014. ECF Dkt. #31. On October 2, 2014, Plaintiff, William Costigan Jr., filed a memorandum in opposition to the motion to dismiss. ECF Dkt. #32. Defendant filed its reply brief on November 3, 2014. ECF Dkt. #34.

I.  FACTS

In the Second Amended Complaint, Plaintiff asserts that Defendant, through its agent, formerly known as Manufacturers Life Insurance Company ("Manulife"), fraudulently induced Plaintiff to purchase a life insurance policy[1] on the life of William Costigan Sr. ("the insured"), as

---

[1] The policy at issue is a "Flexible Premium Adjustable Life" policy which is commonly referred to as a Universal Life policy. There is no set or fixed premium associated with it. Rather, the Policy needs to have sufficient value in it, via the payment of premiums, to cover the monthly charges that are deducted and the cost of insurance ("COI"). Universal Life policy, ECF Dkt. #31-2 at p. 3.1.

For every premium payment received, a premium charge is deducted, 10% in this instance. *Id.* The remaining portion of the premium is applied to the Policy, thereby generating a Policy Value. *Id.* at p. 7. At the start of each monthly period (in this case the 22nd day of each month), charges are deducted from the Policy Value and at the end of each monthly period, interest is credited to the account. *Id.* The charges deducted each month, referred to as monthly deductions in the Policy, consist of an administration charge ($10 per month) and the COI that needs to be purchased for that month to cover the death benefit. *Id.* at p. 7-8. As the policy explains, the COI typically increases as the life insured ages, in this case, from $3.9333 per $1,000 of Net Amount at Risk at age 73 to $22.6358 per $1,000 of Net Amount at Risk by age 93. *Id.* at p. 4.) As long as there is sufficient value in the Policy to cover the monthly deductions, the Policy will remain in force.

a part of his business plan/investment (buy-sell). Second Amended Complaint, ECF Dkt. #26, at ¶ 4. Plaintiff further asserts that Defendant represented that the Universal Life Policy ("Universal Life policy") at issue "would be a better product than the whole life policy previously purchased on the [insured] and would be affordable, *i.e.* that as the insured aged, the premiums would remain relatively level and affordable." *Id.*

In addition, Plaintiff contends that Defendant "tailored its written sales solicitations to lead a reasonable policy holder to conclude that the Universal policy, unlike the 20-year level term policy, would remain affordable for life and that any payment after 20 years[2] would not materially increase beyond the level 'planned premium' of $21,000." *Id.* at ¶ 5. He further contends that "[a]t various times it provided this information, both directly and through its soliciting agent, [Defendant] knew that the 'current and assumed' returns, part of a superior returns marketing pitch, were materially misleading as were the accompanying affordability representations about the [Universal Life] policy." *Id.* at ¶ 6. Plaintiff continues, "In spite of this knowledge, [Defendant] and its agents emphasized the so-called current return as proof that [the Universal Life policy] would be

---

The amount of insurance that needs to be purchased for a given month is equal to the Face Amount less the Policy Value. *Id.* at p. 7. Thus for example, where, as here, the Face Amount of a policy is $350,000.00, if there was a hypothetical policy value of $35,000.00, the amount of insurance that would need to be purchased for a given month would be $315,000.00. The difference between the face value of the Policy (the death benefit) and the Policy Value is referred to as the "Net Amount At Risk." *Id.* To determine the actual COI for a given month, the Net Amount at Risk (the insurance that needs to be purchased) is multiplied by the current COI rate. *Id.* The maximum COI rates increase each year as Plaintiff's father, the life insured, aged and are set forth in the Policy. *Id.* at p. 4.

[2]Plaintiff purchased the Universal policy on June 22, 1993, when the insured was 72 years of age. The policy had a death benefits of $350,000.00. The policy provided for a "Planned Premium" of $21,000.00, beginning on June 22, 1993. Universal Policy, ECF Dkt. #31-2 at p. 3. The Policy reads, in pertinent part, "THIS POLICY PROVIDES LIFE INSURANCE COVERAGE FOR THE LIFETIME OF THE LIFE INSURED IF SUFFICIENT PREMIUMS ARE PAID. PREMIUM PAYMENTS IN ADDITION TO THE PLANNED PREMIUM SHOWN MAY NEED TO BE MADE TO KEEP THIS POLICY AND COVERAGE IN FORCE." *Id.*

Attached to the original complaint is a "Universal Life Accumulation Proposal" executed by the parties on June 25, 1993. The proposal states that the annual premium for the first twenty years of the Universal policy is $21,000.00 Universal Life Accumulation Proposal, ECF Dkt. #1-1 at p. 7. Under the caption, "CURRENT COLUMN ASSUMPTIONS," the proposal further reads, "Based on the Current factors, additional funds will be required in year 21 or the policy will lapse." *Id.* at p. 8.

affordable for life – when in fact [Defendant] knew or should have known that this 'current return' would not materialize at the commencement of the policy or at any time in the foreseeable future." *Id.* at ¶ 7. Plaintiff concludes that "[Defendant] knew that its past historical experience (*i.e.* - in high interest rate environments) was not a valid predictor of the future likely return on the [Universal Life] policy and yet, upon information and belief, used this historical data to prepare false and misleading likely scenarios about future policy performance." *Id.* at ¶ 8.

According to the Second Amended Complaint, Plaintiff made an inquiry in 2010 – after purchasing a life insurance policy on his own life and needing to prepare a cash flow analysis – and Defendant first revealed that the annual premium payment on the Universal Life policy would increase substantially in year 21 assuming that the insured lived beyond June 22, 2013. Defendant further informed Plaintiff that he would be required to make the materially increased payments, in spite of his protests, or the policy would be deemed out of force and cancelled. *Id.* at ¶ 9.

Based upon the foregoing allegations in the Second Amended Complaint, Plaintiff asserts claims for negligent misrepresentation, fraud, and breach of contract/implied duty of good faith and fair dealing. In addition, Plaintiff asserts a breach of contract/express promise claim predicated upon Defendant's failure to provide annual statements regarding the Universal Life policy's performance, even though it had a contractual duty to do so. Plaintiff relies on a provision in the Universal Life policy, captioned "Annual Statement," which reads, in its entirety:

> Within 30 days after each Policy Anniversary, we will send you a report showing:
>
> (a) the Death Benefit;
>
> (b) the Policy Value;
>
> (c) any Loan Account balance and loan interest charged since the last report;
>
> (d) the premiums paid and policy transactions for the year;
>
> (e) any further information required by law.

Policy, ECF Dkt. #1-1 at p. 14. As a result, Plaintiff claims he lost the right to cancel the Universal Policy had he known that premiums would increase after policy year 20. *Id.* at ¶ 13.

## II. THE CLASS ACTION SETTLEMENT

In the first part of the motion to dismiss, Defendant contends that all of Plaintiff's claims were released by virtue of a class action settlement that was finalized in the Southern District of California in 1998 in *Friedman v. Manufacturers Life*, 3:96CV230. Plaintiffs in the class action accused Manulife of misrepresentations and omissions of information made in the course of selling insurance policies that included a "vanishing" point – that is, a time at which future dividends on a policy, paid-up cash values, or other policy assets would collectively suffice to pay future premiums as they came due. The settlement class consisted of all persons who on or before June 19, 1998 had an ownership interest in a Manulife individual participating and/or Universal Life policy issued from January 1, 1982 through December 31, 1993. Plaintiff purchased his Manulife Policy on June 22, 1993, making him a member of the class.

For class members who did not opt out of the settlement, the district court held that "[t]he terms of the Settlement Agreement and of this Final Judgment . . . shall be forever binding on, and shall have res judicata and preclusive effect in all pending and future lawsuits . . .maintained by the plaintiffs and all other Class Members . . . ." Final Judgment, ECF Dkt. #31-4 at 6.

As part of this settlement agreement, the class members released:

> any and all past or presently existing Claims, including known, unknown, suspected or unsuspected, that are based upon, related to, or directly connected with, in whole or in part, the allegations and subject matters referred to in the Complaint or the Released Transactions[.]

*Id.* at 8.

The term "Released Transactions" was defined as:

> any and all acts, communications, omissions, or nondisclosures relating to or connected with the marketing, solicitation, application, sale, purchase, operation or retention of the Policies, based upon the following:
>
> (1) Policy illustrations, marketing materials or sales presentations setting forth a single, fixed limited number of out-of-pocket premium payments based on then-current, non-guaranteed assumptions about dividend scales, interest crediting rates, policy credits, administration charges, contract charges and/or cost of insurance to purchase, maintain and keep the Policy in force throughout the insured's life, or for a specified period of time beyond the number of premium payments illustrated, promised or represented, without a reduction in the Policy's death benefits;

>
> (2) a concept under which a Policy's required premiums or charges may be paid out of its current and/or accumulated values, as those premiums or administration charges, contract charges or costs of insurance became due;
>
> (3) the ability of Plaintiffs and the Class Members to keep the Policies in force based on a fixed number and/or amount of out-of-pocket premium payments;
>
> (4) the dollar or monetary amount that would be accumulated or paid under a Policy based on a fixed number and/or amount of out-of-pocket premium payments;
>
> (5) Defendants' policies and practices with respect to dividends, account values, policy loans, credited interest rates, cost of insurance, administrative charges, contract charges and/or other Policy or premium charges, account value calculations, lapse supported pricing or death benefit;
>
> (6) the cost of term-rider coverage on the Policy relative to Policy coverage, the affect of term rider coverage on the cost of the Policy and the ability of Policies with term rider premiums to offset or vanish in future years;
>
> (7) the Deferred Acquisition Cost statutory accounting charge;
>
> (8) the use of direct recognition of Policy loans in the calculation of Policy benefits, dividends, interest crediting rates and/or costs;
>
> (9) the manner in which Defendants trained and supervised any of the Releasees, including, but not limited to, Defendants' general agents, agents, branch managers, Producers, brokers, or any of them, relating to the allegations set forth in the Complaint, or the Released Transactions set forth in items (1) through (8) above.
>
> d. Released Transactions does not include claims for replacement, sale of life insurance as retirement, savings, pension or other investment plans, servicing, administration, forgery or theft.

*Id.* at 7-8.

> The release further provides that class members will:
>
> release and discharge the Releasees from any and all past or presently existing Claims, including known, unknown, suspected or unsuspected, that are based upon, related to, or directly connected with, in whole or in part, the allegations and subject matters referred to in the Complaint or the Released Transactions, or in connection with or related to in any manner to, the settlement of the Action . . . .

*Id.* at 8. Class members were also expressly barred from commencing, maintaining, or asserting "any Claims that are based upon, related to, or directly connected with, in whole or in part, the allegations and subject matters referred to in the Complaint or the Released Transactions." *Id.* at 8. As a result, class members who did not opt out of the class were permanently enjoined from bringing any lawsuit in any jurisdiction. *Id.* at 9. Plaintiff did not opt out of the class and is bound by the terms of the class action settlement.

-5-

### III.  PROCEDURAL HISTORY

In April of 2014, Plaintiff filed suit against Defendant in the Court of Common Pleas, Summit County, Ohio. Defendant timely removed the action. Plaintiff's initial Complaint included claims for fraud, negligent misrepresentation, negligence, breach of contract, and declaratory relief. See generally Complaint, ECF Dkt. # 1. On June 25, 2014, Plaintiff amended the complaint, withdrawing his fraud claim. ECF Dkt. # 12. However, on August 8, 2014, Plaintiff filed the Second Amended Complaint, reinserting the fraud claim. ECF Dkt # 26. On September 4, 2014, Defendant filed the Motion to Dismiss the Second Amended Complaint, alleging that Plaintiff's claims were released pursuant to the class action settlement, or, in the alternative, that Plaintiff's claims should be dismissed on other grounds.  ECF Dkt. #31.

### IV.  STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir.1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action ..." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct at 1966).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In contrast to the liberal pleading standard in Rule 8, Federal Rule of Civil Procedure 9 requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) . To meet the particularity requirement of Rule 9(b), a plaintiff who brings a fraud claim must generally "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Marlar v. BWXT Y-12 L.L. C.*, 525 F.3d 439, 444 (6th Cir.2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir.2003)). The complaint must "alert the defendants 'to the precise misconduct with which they are charged' " to protect them " 'against spurious charges of immoral and fraudulent behavior.' " *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir.2006) (quoting *United States ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir.2002)).

The plaintiff may make allegations of fraud based upon information and belief, but such complaints "must set forth a factual basis for such belief." *Sanderson*, 447 F.3d at 878 (quoting *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997)).  Courts must, however, read Rule 9(b) in conjunction with Federal Rule of Civil Procedure 8. *United States ex rel. Bledsoe v. Cmty Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir.2007). Rule 8 is commonly understood to encourage "notice pleading" as opposed to creating technical requirements which would prevent the court from reaching the merits of a claim. *Id.* "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Id.*

## V. ANALYSIS

### A. Class action settlement release

Defendant contends that Plaintiff has released each and every claim in the Second Amended Complaint due to his participation in the class action settlement in the *Friedman* case.  Plaintiff makes three allegations in the Second Amended Complaint: (1) Defendant represented that the Universal Life policy was a "better product" than the existing whole life policy; (2) Defendant represented that the Universal Life policy would be affordable after year twenty based upon the current return; and (3) Defendant failed to provide annual policy information that would have put Plaintiff on notice that the Universal Life policy premiums would increase dramatically after year twenty.

Defendant has twice filed motions to enforce the settlement in the class action in order to foreclose relief sought in state court actions predicated upon misrepresentations surrounding the purchase of Manulife policies.  However, the Southern District of California has declined on both occasions to give a broad reading to the release language in the class action settlement.  In fact, the Court has specifically rejected the argument that claims alleging misrepresentations regarding the comparative value of the Universal Life policy versus a whole life policy, as well as the general affordability of the Universal Life policy were included in the class action release.  In 2008, the Southern District of California wrote, "The allegations of the class action complaint are based on misrepresentations in connection with the vanish point scheme as described above and do not appear to encompass general misrepresentations regarding financial advisability and affordability, lapse dates, or policy benefits." *In re Manufacturers Life Insurance Company Premium Litigation*, 2008 WL 4950939, at *3.

In 2012, the Southern District of California was presented a second opportunity to interpret the class action release.  The Court again held that "[a]llegations . . .regarding broadly phrased misrepresentations and omissions about the long-term affordability of the policy and the policy's suitability for the [plaintiffs'] particular estate planning objectives, could potentially fall into [the category of claims unrelated to the vanishing point policies and practices described in the Release.]" *In re Manufacturers Life Insurance Company Premium Litigation*, 3:96CV230, Southern District

-8-

of California, ECF Dkt. #188 at p. 11.   The Court further observed that the release does not apply to post-settlement allegations, such as the conduct alleged here regarding Defendant's failure to provide annual policy information. *Id.* at 8.

Defendant contends that the class action complaint and release speak not only to the vanishing premium scheme but also "policy performance" sales concepts. ECF Dkt .#34 at p. 4. Defendant writes, "Like the class action plaintiffs, Plaintiff contends that [Defendant] made various representations, including in policy illustrations that the premiums required to keep the [Universal Life policy] in force would not increase over the course of his father's lifetime.  In addition, like the class action plaintiffs, Plaintiff asserts that those representations were made at the point of sale and induced him to purchase the policy." *Id.*  To the contrary, Plaintiff does not allege that the premium would not increase, but, instead, that the premium would remain affordable over the course of his father's lifetime.

Next, Defendant contends that Plaintiff's claims fall within the definition of "released transactions," to the extent that term includes "[p]olicy illustrations, marketing materials or sales presentations setting forth '[the] . . .cost of insurance to purchase, maintain and keep the Policy in force throughout the insured's life, or for a specified period of time beyond the number of premium payments illustrated, promised, or represented . . . ." *Id.*   However, the forgoing quoted portion of subsection (1) of the release does not include the following relevant language:

> Policy illustrations, marketing materials or sales presentations setting forth **a single, fixed limited number of out-of-pocket premium payments** based on then-current, non-guaranteed assumptions about dividend scales, interest crediting rates, policy credits, administration charges, contract charges and/or cost of insurance to purchase, maintain and keep the Policy in force throughout the insured's life, or for a specified period of time beyond the number of premium payments illustrated, promised or represented, without a reduction in the Policy's death benefits. (Emphasis added.)

Insofar as subsection (1) of the release speaks solely to policy illustrations, marketing materials, or sales presentations regarding vanishing premium policies, the undersigned finds that Defendant's motion to dismiss the Second Amended Complaint based upon the release is the class action settlement does not have merit.

-9-

### B. Negligent representation claims

The parties agree that the applicable statute of limitations for the claim of professional negligence is R.C. 2305.09(D), which provides:

> Except as provided for in division (C) of this section, an action for any of the following causes shall be brought within four years after the cause thereof accrued:
>
> * * *
>
> (D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code.

The parties disagree about when the statute of limitations in R.C. 2305.09(D) begins to run. The statute itself states only that an action must be brought within four years "after the cause thereof accrued." However, the legislature did not define "accrue." The general rule is that a cause of action exists from the time the wrongful act is committed. *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 87, 447 N.E.2d 727.

However, in certain circumstances the Ohio Supreme Court has determined that applying the general rule " 'would lead to the unconscionable result that the injured party's right to recovery can be barred by the statute of limitations before he is even aware of its existence.' " *O'Stricker*, 4 Ohio St.3d at 87, 447 N.E.2d 727, quoting *Wyler v. Tripi* (1971), 25 Ohio St.2d 164, 168, 54 O.O.2d 283, 267 N.E.2d 419. As a result of these concerns, this court created an exception to the general rule, commonly known as the discovery rule.

The Ohio Supreme Court specifically addressed the application of the discovery rule to a claim for professional negligence involving accountants in *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206. The Court noted that R.C. 2305.09 expressly includes its own limited discovery rule: "If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered." *Id.* at 181. Because the General Assembly had not included general negligence claims within this limited discovery exception, the Ohio Supreme Court held that "[t]he discovery rule is not available to claims of professional negligence brought against accountants." *Id.* at paragraph 2a of the syllabus. The holding was reaffirmed in *Grant Thornton v. Windsor House* (1991), 57 Ohio St.3d 158, 566 N.E.2d 1220.

The delayed-damages rule concerns another timing issue: when all elements of a cause of action have come into existence. "To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom." *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265. Under the delayed-damages rule, "where the wrongful conduct complained of is not presently harmful, the cause of action does not accrue until actual damage occurs." *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 379, 433 N.E.2d 147. In other words, a cause of action for negligence is not complete, and the statute of limitations does not begin to run, until there has been an injury.

The Ohio Supreme Court applied the rule in a case involving the purchase of insurance coverage in 1982, writing: "The statute of limitations as to torts does not usually begin to run until the tort is complete. A tort is ordinarily not complete until there has been an invasion of a legally protected interest of the plaintiff." *Kunz v. Buckeye Union Ins. Co.* (1982), 1 Ohio St.3d 79, 81, 437 N.E.2d 1194 (internal citation omitted). In *Kunz*, the plaintiffs alleged that their commercial insurer failed to provide the requested coverage for property and equipment loss. The Ohio Supreme Court concluded that "there was no invasion, or infringement upon or impairment of [a legally protected interest] until there had been a loss to [the plaintiffs'] equipment because until [the fire] occurred such protection could avail [the plaintiffs] nothing. Their interest was in having protection when it was needed." *Id.* at 81-82. To adopt the opposite conclusion, according to the Ohio Supreme Court, "would in essence require an insured to consult legal counsel whenever he consolidated or renewed an insurance policy so as to avoid statute of limitations problems when a claim eventually arises." *Id.* at 82.

Although the Supreme Court has not expressly overruled *Kunz*, it has since declined to follow the holding in other causes of action alleging professional negligence that are governed by R.C. 2305.09. In *Flagstar Bank v. Airline Union's Mortgage Co.*, 128 Ohio St.3d 529, 947 N.E.2d 672, the Court held that "[a] cause of action for professional negligence against a property appraiser accrues on the date that the negligent act is committed, and the four-year statute of limitations commences on that date." *Id.* at syllabus. The Court in *Flagstar* flatly rejected the application of the

-11-

"delayed-damages rule" in the case and expressly overruled several cases (other than *Kunz*) applying the rule to professional negligence cases.

Ohio appellate courts are at odds with respect to the continuing viability of *Kunz*. The Eleventh District Court of Appeals has recognized its continuing precedential effect, despite the intervening case law in *Flagstar*, which the Eleventh District strictly limited to cases involving property appraisers, based upon the specific language in the *Flagstar* syllabus. *See Vinecourt Landscaping v. Kleve*, 2013 WL 6875468 (11th Dist.). The Eleventh District also relied upon a direct reference to *Kunz* in *Flagstar*. Early in the opinion, the *Flagstar* Court wrote:

> We have also applied the rule to a case involving the purchase of insurance coverage, stating: " 'The statute of limitations as to torts does not usually begin to run until the tort is complete. A tort is ordinarily not complete until there has been an invasion of a legally protected interest of the plaintiff.' " *Kunz v. Buckeye Union Ins. Co.* (1982), 1 Ohio St.3d 79, 81, 1 OBR 117, 437 N.E.2d 1194, quoting *Austin v. Fulton Ins. Co.* (Alaska 1968), 444 P.2d 536, 539.

*Id.* at 677.

Conversely, in *Auckerman v. Rogers*, 2012 WL 29345 (2d. Dist.), discretionary appeal not allowed by 132 Ohio St.3d 1463, 969 N.E.2d 1231, the Second District Court of Appeals reviewed the foregoing case law and concluded that the *Flagstar* Court implicitly overruled *Kunz* with regard to application of the delayed-damages rule in cases of professional negligence governed by R.C. 2305.09.*Auckerman* at *4. The court pointed out that the *Kunz* Court characterized a negligent-procurement claim against an insurance agent as one alleging negligent performance of "professional services," *Id.*, citing *Kunz* at 80, and that " 'a cause of action for professional negligence accrues when the act is committed.' " *Auckerman*, quoting *Flagstar*. As a consequence, the *Auckerman* court reasoned that *Flagstar* "foreclosed the application of a discovery or a delayed-damages rule in cases involving professional negligence governed by R.C. 2305.09." *Auckerman*, supra. The *Auckerman* court acknowledged that, even though *Flagstar* addressed an appraiser's professional negligence and *Investors REIT One* addressed accountant negligence, it saw "no principled reason why an insurance agent's professional negligence should be treated differently." *Auckerman*, supra, at *4.

-12-

Having considered the conflicting Ohio appellate court decisions, the undersigned agrees with the Second District's conclusion that *Flagstar* foreclosed the application of a discovery or a delayed-damages rule in cases involving professional negligence governed by R.C. 2305.09. *Auckerman*, supra. The Eleventh District's strict reading of the holding in *Flagstar* offered no explanation of the fact that *Flagstar* expressly abrogated cases applying the delayed-damages rule in previous cases involving accountants in *Gray v. Estate of Barry*, 101 Ohio App.3d 764, 656 N.E.2d 729 (6th Dist. 1995), and *Fritz v. Bruner Cox, L.L.P.*, 142 Ohio App.3d 664, 756 N.E.2d 740 (5th Dist. 2001), and title companies and loan servicers in *JP Morgan Chase Bank NA v. Lanning*, 2008 WL 588804 (5th Dist.).

For instance, *Gray* involved the negligent preparation and filing of a tax return. The Sixth District held that the statute of limitations did not begin to run prior to the assessment of the I.R.S. penalty, citing *Kunz, supra*. Echoing *Kunz*, the *Gray* Court opined:

> Since there can be no negligence without injury, there can be no negligent conduct by which a cause accrues, pursuant to *Holsman*, until there is an injury to a legally protected interest. In the case of a negligently prepared tax return or a tax form negligently omitted from a return, there is no injury until the I.R.S. determines to levy a penalty assessment. Until that time, no claim upon which relief can be granted exists. Similarly, it is not until such a claim may be maintained that the time for any statute of limitations begins to run.

*Gray*, 101 Ohio App.3d at 768-769; see also *Fritz*, supra at 142 Ohio App.3d at 743 and *Lanning*, supra at *3 (quoting the foregoing passage from *Gray* with favor).

Although the Ohio Supreme Court did not expressly overrule *Kunz*, the *Flagstar* Court vacated three appellate court opinions predicated upon the legal reasoning first articulated in *Kunz*. As a consequence, Plaintiff's negligent misrepresentation claim is time-barred, and Defendant's motion to dismiss the claim is well-taken.

### C.  Fraud

Claims of fraud and fraudulent concealment have the same basic elements: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of inducing another into relying upon it; (5) justifiable reliance upon the representation or concealment;

-13-

and (6) resulting injury proximately caused by the reliance. *Republic Bank v. Conner*, 9th Dist. No. 25028, 2010-Ohio-5212, ¶ 25; *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984).

Rule 9(b) requires that fraud be pled with particularity, and, to satisfy Rule 9(b), a plaintiff must at a minimum allege the time, place and content of the alleged misrepresentation on which he or she relied, the fraudulent scheme, the fraudulent intent of the defendant, and the resulting injury. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010). General and conclusory allegations do not satisfy Rule 9(b). *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir. 1990). Courts do not hesitate to dismiss fraud claims where this standard is not met. See *United States ex rel. Bledsoe v. Cmty Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003) (dismissing plaintiff's claims for failure to set forth the dates or the particular circumstances of the alleged incidents of fraudulent conduct or to name the particular individuals engaged in the alleged fraudulent practices).

Here, Plaintiff's fraud claim fails to meet these standards. Plaintiff has failed to set forth the time, place and content of the alleged misrepresentation on which he relied, the fraudulent scheme, the fraudulent intent of Defendant, or the particular circumstances of the alleged incidents of fraudulent conduct. He has also failed to name the particular individuals engaged in the alleged fraudulent practice. Nor has he alleged that the relevant information is solely in Defendant's possession. As a consequence, the general and conclusory allegations regarding "affordability" offered by Plaintiff are insufficient and, as a result, the fraud claim must be dismissed.

### D. Breach of Contract/Duty of Good Faith

Under Ohio law, because a fiduciary relationship exists in the context of insurance contracts, the insurer has a duty to act in good faith in handling the claims of the insured. *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 275, 452 N.E.2d 1315 (1983). However, this implied duty does not supplant express contract terms. *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 75 Ohio St.3d 433, 662 N.E.2d 1074 (1996). Rather, it requires good faith in performing those contract terms. *Lakota Local School Dist. Bd. of Edu. v. Brickner*, 108 Ohio App.3d 637, 671 N.E.2d 578, 584 (1996) ("good faith is part of a contract claim and does not stand alone.").

Here, the Universal Life policy does not impose a duty on Defendant to set future premiums at or near $21,000, and, thus, the implied duty of good faith and fair dealing cannot create such a duty. *Id.* at ¶¶ 27-29 (granting motion to dismiss claim for breach of the duty of good faith and fair dealing where the parties' contract did not require the insurer to search a death master file to determine whether their insureds were deceased).

The Universal Life policy at issue in this case did not provide for a level or fixed premium. Plaintiff contends that Defendant has discretion in determining the premium in year 21, Defendant asserts that it has no discretion, but, rather, the future premiums are based on the COI for the Net Amount at Risk (the difference between the death benefit and the existing Policy Value). Defendant further argues that the Illustration showed, with respect to the Guaranteed Column values, the Policy Value was projected to be $0 by year 20. In addition, the Universal Life Policy illustrates that the COI per $1,000 would be significantly higher by the time Plaintiff's father reached his nineties than when the Policy was issued.

Here, because the Policy does not create the duty Plaintiff alleges, the duty of good faith and fair dealing is inapplicable. See also *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 274 (1999) (recognizing that "there can be no implied covenants in a contract in relation to any matter specially covered by the written terms of the contract itself."); *Fifth Third Mortgage Co. v. Chicago Title Ins. Co.*, 758 F. Supp. 2d 476 (S.D. Ohio 2010)(recognizing that under Ohio law, the duty of good faith and fair dealing does not supplant express contract terms but only requires good faith in performing those terms). Accordingly, Defendant's motion to dismiss Plaintiff's breach of contract/ duty of fair dealing claim should be dismissed.

### E. Breach of Contract

Finally, Defendant contends that Plaintiff's breach of contract claim is merely a restatement of Plaintiff's negligent misrepresentation, duty of and fraud claims. Plaintiff contends that Defendant was required by the terms of the Universal Life policy to provide annual reports, which, if provided, would have put Plaintiff on notice that the premiums would increase dramatically after year 20. Because Defendant offers no argument in support of the dismissal of the breach of contract

-15-

claim predicated upon the language of the Universal Life policy to provide annual reports, the motion to dismiss is not well-taken.

### VI. CONCLUSION

For the forgoing reasons, Defendant's motion is GRANTED in part, with respect to Plaintiff's negligent misrepresentation, fraud, and breach of contract/breach of the duty of good faith claims, and DENIED in part, with respect to Plaintiff's breach of contract claim.

SIGNED AND ENTERED on this 26th day of March 2015.

*/s/ George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE